REICHERT et al. v. LONG ISLAND R. CO.

(Circuit Court of Appeals, Second Circuit. January 29, 1912.)

No. 83.

NAVIGABLE WATERS (§ 20*)—INJURIES TO VESSELS BY OBSTRUCTIONS—DEFECTIVE BRIDGE.

A finding affirmed on the evidence that the sinking of libelants' tug was due to injuries received on the afternoon before she sank in the morning, by coming in collision with the abutment of respondent's railroad bridge over Flushing creek, Long Island, which respondent had negligently permitted to become and remain out of repair and dangerous.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73-99; Dec. Dig. § 20.*]

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by Jacob Reichert and George W. Kidd, owners of the steam tug Mischief, against the Long Island Railroad Company. Decree for libelants, and respondent appeals. Affirmed.

This cause comes here upon appeal from a decree holding respondent liable for certain injuries to libelant's tug Mischief, alleged to have been caused by a collision between the Mischief and respondent's railway bridge over Flushing creek. The evidence showed quite convincingly that a condition of disrepair had existed for some time, where the wing or smoothing iron contacted with the pin abutment, and that the wing itself gave way excessively under pressure of boats running along to reach the abutment. All the witnesses but two were examined in open court.

Burlingham, Montgomery & Beecher (William S. Montgomery and Roderick Terry, Jr., of counsel), for appellant.

Foley & Martin (William J. Martin and Frank A. Spencer, Jr., of counsel), for appellees.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

PER CURIAM. We think the conclusions of the District Judge, who heard the principal witnesses and believed them, should be accepted upon the disputed questions of fact. There is nothing im-

probable about their story, which fully accounts for what happened. It appears that the tug did come in contact with the abutment, and there is evidence to warrant the finding that she caught in the lower loosened planks. She sank the morning after, and the only adequate explanation of her sinking is the fact of the injury of the afternoon before. It would have been rather remarkable if some other injury had intervened to sink the vessel at this particular time.

We are not impressed by the testimony as to a slight opening on the starboard quarter. Nor are we impressed by the circumstance that the injuries to the port side were not discovered till she sank the next morning. During the rest of her navigation that day, about two hours, only one of the started seams was under water, possibly not so badly started as the others. It is quite probable that whatever water came in through that seam was not more than the bilge pump would discharge. Therefore, until that pump ceased to act, when the engines stopped, there would be nothing to indicate damage. Shortly after she was tied up for the night, all on board left her, siphoned out and dry. Thereafter the water would accumulate, the bilge pump having stopped, slowly at first, until it brought another seam below the water level, which would double the intake, and thereafter, as each of the other three got to water level, the intake would increase still further. Light as she was, with empty tanks, we find nothing improbable in the circumstance that she did not actually sink until the morning after the injuries were received.

We are not satisfied that there was any negligence on the part of the master of the Mischief.

The decree is affirmed, with interest and costs.